

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7331 | **DATE** | 9/4/2002 |
| **CASE TITLE** | Karen S. Metzen a/k/a Karen S. Zalud vs. Jo Anne Barnhart, Commissioner of Social Security | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Plaintiff's Motion for Summary Judgment [12-1] is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | **Document Number** |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | SEP - 6 2002 | |
| | Notified counsel by telephone. | | | date docketed | 21 |
| | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| | | courtroom deputy's initials | | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

SEP 6 2002

KAREN S. METZEN,
a/k/a KAREN S. ZALUD )
)
)
**Plaintiff,** )
)
v. )
)
JO ANNE B. BARNHART,[1] )
**Commissioner of Social Security,** )
)
**Defendant.** )
)

No. 00 C 7331

**Magistrate Judge Nan R. Nolan**

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the

Commissioner of Social Security denying Karen S. Metzen a/k/a/ Karen S. Zalud's ("Zalud") claim

for Disability Insurance Benefits and Supplemental Security Income. This matter is before the Court

on Plaintiff's Motion for Summary Judgment (Docket # 12). The parties have consented to the

jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons

explained below, Plaintiff's Motion for Summary Judgment is DENIED.

## PROCEDURAL HISTORY

Zalud claims she became disabled due to back, neck shoulder ankle, and knee pain and

depression on August 31, 1996. (R. 105.) On May 21, 1997, Zalud applied for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 USCS §§ 216 (I) 223(a) and for

Supplemental Security Income ("SSI") under Title XVI, sections 1602 and 1614 (a) (3) of the Act.

---

[1]Jo Anne B. Barnhart is substituted for her predecessor pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure.

-1-



(R. 25, 92-94, 313-15.) Her application was denied on August 13, 1997 and again on reconsideration on November 3, 1997. (R. 63-70.) The Social Security Commissioner ("Commissioner") found that Zalud's medical condition did not prevent her from working and that she was capable of performing the same type of work she did in the past. (R. 63, 68.) Zalud appealed the Commissioner's decision and requested an administrative hearing, which was held on September 17, 1998. (R. 71-73, 82.)

On February 19, 1999, the Administrative Law Judge ("ALJ") denied Zalud's claim for DIB and SSI, finding that Zalud retains the functional capacity to do sedentary unskilled work that would afford her the opportunity to alternate between sitting and standing at her discretion. (R. 24-25.) Subsequently, Zalud requested a review of the ALJ decision before the Social Security Appeals Council. (R. 8-9.) On September 21, 2000, the Social Security Appeals Council denied Zalud's request for review (R. 5-6), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

A. *__Background__*

Zalud was born on August 31, 1950, and at the time of the ALJ hearing she was 48 years old. (R. 36-37.) She is a little over five feet tall and weighs 151 pounds. (R. 36.) Zalud was divorced in 1987 after twenty years of marriage and has four children. (R. 92, 274.) She claims her only source of income is $150 a month she receives from her daughter. (R. 315.) At the time of the hearing, Zalud had a Worker's Compensation application pending but she had not received any Worker's Compensation benefits. (R. 38, 95-96, 274.)

Zalud reports losing her home due to a $3,000 debt and at the time of the hearing was living with a friend in his rented mobile home. (R. 46, 50.) She completed the ninth grade and attempted

to get her GED several times but failed the test. (R. 37, 274.) Zalud has no other training license or certification and refers to herself as a slow reader. (*Id.*)

Zalud worked as a chemical operator from 1980 to August 1996. (R. 182.) Before her termination on August 31, 1996, she worked an average of forty-eight hours a week, earning $20 per hour. (R. 53, 182-83.) Previously, Zalud worked for four months as an unskilled laborer in the printing industry. (R. 181, 274.)

Zalud claims during her sixteen years of employment as a chemical operator, she was required to transfer and lift 150-pound bags of chemicals daily. (R. 38, 182.) In March 1996, Zalud reports she injured her back while transporting and lifting a fifty-pound chemical bag into a tank. (R. 202.) She experienced severe pain in her right lower back and lumbar region with some radiation into her upper gluteal area and right hip. (*Id.*) Zalud was sent home by her employer and was subsequently evaluated for lower back pain by Dr. Sinha and Dr. Cerniak. (R. 197, 200.)

On April 23, 1996, Dr. Sinha, an orthopedic surgeon, performed a CT myelogram, a CAT scan, and took several x-rays. (R. 197, 218-22.) On July 18, 1996, Dr. Sinha indicated Zalud could return to work with a restriction not to lift more than ten pounds. (R. 218.)

Dr. Cerniak, the company physician, also saw Zalud for the March 1996 back injury. (R. 200.) On June 17, 1996, he diagnosed right L5-S1 disc displacement radiculopathy and also recommended Zalud return to work and remain on light duty with no bending, twisting, squatting, kneeling or climbing and no lifting over ten pounds. (*Id.*)

Subsequently, she returned to work and was put on light duty but the record does not indicate the exact date of return. (R. 39, 184.) Zalud claims she was sent home by her employer on August 31, 1996 because she could no longer continue her employment due to her alleged disability. (R.

182-84.) Zalud testified that she was let go after she had succeeded in training her replacement. (R. 37, 39.)

**B.**     _Medical/Psychiatric Evidence and Testimony_

   **1.     Medical Evidence**

The record reflects Zalud had a history of back and leg pain from work-related injuries dating back to 1984. (R. 189, 229, 236.) On April 11, 1984, Zalud claims she twisted and injured her back while attempting to grab a 100-pound object. (R. 189, 236.) From July to September 1984, Zalud was treated by Dr. Sinha, the orthopedic surgeon, for this work-related injury. (R. 189, 248-49.) He reported that routine lab tests were within normal limits, an EMG was normal, and a CAT scan showed a borderline bulging disc at L5, S1. (*Id.*) Dr. Sinha reported that essentially there was not much in the way of objective findings and recommended conservative treatment including physical therapy. (R. 250-51.)

In August 1984, Zalud complained to Dr. Sinha that she did not get much relief from physical therapy, so he referred her to St. Mary's Hospital for a lumbar myelogram. (R. 249.) The myelogram was performed on September 4, 1984, and the results were normal. (*Id.*) On September 18, 1984, Zalud complained to Dr. Sinha of the same symptoms. (*Id.*) He reported there were no objective clinical findings whatsoever and no neurological deficits, so he referred Zalud to a pain clinic. (*Id.*)

In January 1985, Zalud sought pain management therapy at the Methodist Medical Center of Illinois and was seen by Dr. Alexander. (R. 240-44.) Dr. Alexander opined that Zalud had a chronic lumbosacral strain and would benefit from using a TENS (transcutaneous electrical nerve stimulation) unit, and that a back biopsy and relaxation therapy would be part of Zalud's therapeutic

-4-

program. (R. 241.) In April 1995, Dr. Alexander reported that Zalud had improved through relaxation therapy and the use of the TENS unit in the lumbosacral area. (R. 235.)

When Dr. Sinha examined Zalud on April 30, 1985, she complained about the continuation of her diffused lower back pain but claimed some relief from the use of the TENS unit and relaxation therapy. (R. 233.) Upon physical examination, Zalud continued to demonstrate full range of motion of the lumbosacral spine and no neurological deficits. (*Id.*) Dr. Sinha reported that "It was decided to send her to work again. At least she must try." (*Id.*) Dr. Sinha recommended Zalud continue to wear the TENS unit for a few more months and return to work with light duty for three weeks before returning to her regular work. (*Id.*)

On August 1, 1985, Dr. Sinha reexamined Zalud and reported she had no leg or back pain and no neurological deficits. (R. 232.) He further reported that she had full painless range of motion of the lumbosacral spine. (*Id.*) Dr. Sinha discharged Zalud and instructed her to return to work on August 5, 1985. (*Id.*) On October 3, 1985, Zalud was still complaining of low back pain, and a CAT scan was performed at St. Mary's Hospital on October 7, 1985. (R. 229.) Dr. Sinha reported the scan was normal, and he could not find any specific clinical reasons for her chronic complaints of lower back pain. (R. 229-30.)

Dr. Sinha's December 1985 notes indicate that Zalud had an extensive medical work-up for complaints of lower back pain from May 5, 1983 until October 1985, but no findings of neurological deficits or lab tests to support a specific diagnosis. (*Id.*) He reported "definitely this patient is not disabled" and again advised her to return to her regular job with some weight restrictions on October 17, 1985. (*Id.*)

Zalud's medical records are unremarkable or nonexistent until February 29, 1996, when she had an x-ray of her lumbar spine that indicated minimal narrowing of the intervertebral joint space at L5-S1 and L3-4. (R. 192.) A March 1996 low back MRI scan indicated significant arthritic bony changes with reactive sclerosis of the adjacent bone margins at L5-S1 level noted. (R. 194.) In April 1996, Zalud complained to Dr. Cerniak, the company physician, that she had back pain since March 1996 when she lifted a fifty-pound bag at work. (R. 202.) Dr. Cerniak viewed the March MRI scan and noted that it was consistent with spinal nerve root involvement. (*Id.*) He indicated Zalud had normal strength sensation in her legs. (*Id.*) Dr. Cerniak diagnosed spinal nerve disease and degenerative changes of the lower spine but stated that Zalud could perform light duty work including no lifting over fifteen pounds with occasional bending, twisting, squatting, kneeling, and climbing. (*Id.*) Dr. Cerniak also indicated that Zalud may need a microdiscectomy to relieve her symptoms. (*Id.*)

On April 23, 1996, Zalud had a CT scan of her lumbar spine and a low back myelogram. (R. 195-96.) The CT scan indicated significant degenerative changes in the intervertebral disc with posterior central herniation along with encroachment on the right lateral recess. (R. 195.) A low back myelogram indicated amputation of the right axillary nerve root sleeve and partial amputation of the left nerve root sleeve. (R. 196.)

On June 17, 1996, after reviewing Zalud's CT scan and myelogram, Dr. Cerniak reported the findings were consistent with a disc herniation. (R. 200.) He diagnosed Zalud with disc displacement radiculopathy (spinal nerve disease) and recommended Zalud remain on light duty with no bending, twisting, squatting, kneeling or climbing, no lifting over ten pounds. (*Id.*) Dr. Cerniak

stated Zalud was medically cleared to return to work with these restrictions and should proceed with surgical repair of her disc herniation upon the approval and advice of her neurosurgeon. *(Id.)*

On September 25, 1996, Dr. Sinha recommended light duty work restrictions and advised Zalud to avoid heavy lifting with a weight limit of ten pounds. (R. 222.) Dr. Sinha also recommended laminectomy surgery. *(Id.)*

On June 17, 1997, Zalud's family physician Dr. Lee reported that her low back pain and generalized pain were the result of degenerative joint disease. (R. 270.) Dr. Lee found Zalud did not have any sensory or reflex loss, and no evidence of nerve root compression and slight reduction in her back range of motion. (R. 269.) He reported Zalud could walk and lift up to ten pounds but her ability to do work-related activities was limited due to pain. (R. 271.)

On June 24, 1997, after reviewing the March 1996 MRI report and the April 1996 CT myelogram, Dr. Sinha recommended Zalud avoid heavy manual work and again stated that she might require lumbar laminectomy due to a herniated lumbar disc L5-S1. (R. 282-83.)

On June 16, 1997, Dr. Lee referred Zalud to Dr. Kattner for a neurosurgery consultation. (R. 287.) Upon initial examination Dr. Kattner noted no motor deficits or sensory deprivation. *(Id.)* Dr. Kattner stated that he would have to obtain additional spinal x-rays before he could determine that Zalud had sufficient motion to be considered a surgical candidate. *(Id.)*

Dr. Kattner saw Zalud again on July 14, 1997, and he reported that her lumbar x-rays were essentially unremarkable for any type of motion and that she would not benefit from neurosurgical intervention. (R. 286.) He recommended a more conservative approach including physical therapy or pain management therapy. *(Id.)* Dr. Kattner stated he would arrange for Zalud to be evaluated by Dr. Benyamin, a pain management specialist, to determine whether Zalud was an appropriate

candidate for trigger point therapy. (*Id.*) Dr. Kattner's progress notes indicate that Zalud did not show for her appointment with Dr. Benyamin. (R. 284.) On August 5, 1997, Zalud was contacted by Dr. Kattner's office at which time she stated she was not interested in an appointment with Dr. Benyamin. (*Id.*)

## 2. Psychiatric Evidence

On May 30, 1997, Zalud was evaluated for depression by Dr. Corrall of the BroMenn Healthcare Emergency Room. (R. 259.) Zalud expressed multiple stress factors in her life including the loss of her home, her inability to return to work, and the need for back surgery, which she stated she was unable to secure because her "insurance refuse[d]" to pay for it. (*Id.*) She stated that she thought about taking her life with an overdose of pills but later expressed to Dr. Corrall that she would never "do herself in." (*Id.*) Dr. Corrall examined Zalud and reported she elicited excellent motor strength in her upper and lower extremities. (R. 260.) He diagnosed situational depression and suicidal ideation and discharged Zalud two hours after her arrival with a recommendation to follow up with a day treatment program. (*Id.*)

On June 25, 1997, Dr. Jacobs, a psychologist, conducted a consultative examination. (R. 274-76.) Dr. Jacobs reported that Zalud had contemplated suicide but never made any attempts on her life. (R. 275.) Zalud stated her depression began in October 1996 but that she previously had "depression due to work related problems involving a foreman." (*Id.*) She denied being depressed upon dismissal from her job as a chemical operator. (*Id.*) She also denied having any difficulty with groups and was not prone to argue or fight. (*Id.*) Zalud describes herself as "getting along well with others." (*Id.*) Dr. Jacobs reported that Zalud considered her emotional issues to be her greatest

health concern. (*Id.*) She stated "I feel like I'm walking a fine line…either I want to die or disappear because this ain't living…. just existing." (*Id.*)

Dr. Jacobs found Zalud was oriented and her thinking was free of delusion, paranoia, hallucinations, and grandiosity. (R. 276.) He reported that Zalud denied any prior history of psychological treatment but stated that her family physician had prescribed medication for depression in the past, and at the time of the interview, Zalud was taking the antidepressants Ativan and Elavil. (R. 275-76.) Zalud informed Dr. Jacobs that she had recently begun seeing a psychiatrist and a counselor on a weekly basis, but that she had only one appointment with each one so far. (*Id.*) Dr. Jacobs diagnosed dysthymia, low back pain, a history of alcohol dependence, and he found Zalud was capable of managing her own benefits. (R. 276.)

In July and October 1997, Dr. Dimond, a medical consultant for the Social Security Administration, reviewed Zalud's record and found her dysthymia was secondary to her physical limitations and back pain. (R. 175.) He reported that Zalud could comprehend and recall complex, detailed instructions and could socialize and adjust but preferred limited social contacts. (*Id.*) Dr. Dimond also found that from a psychological standpoint, Zalud was still capable of performing simple substantial gainful activity. (*Id.*)

### 3.    Zalud's Testimony

Zalud testified at the hearing that she was forty-eight years old, had completed the ninth grade, and did not have a GED or any training license or certification. (R. 36-37.) She was unemployed and living with a friend. (*Id.*) She had worked at a manufacturing plant as a chemical operator from 1980 to 1996. (R. 37- 38.) Her job responsibilities included running a salt mating reactor that required bending. transferring products in and out of buildings and tanks, and lifting 150-

pound bags on a daily basis. (R. 38.) She worked on the second level and had to go up and down flights approximately three times an hour. (*Id.*)

Zalud indicated that prior to her discharge, the company physician recommended light-duty restriction because of work related back injuries. (R. 39.) She testified that she was injured at work but did not receive Worker's Compensation benefits. (R. 38.) She claims she was sent home by her former supervisor after using her to train her replacement. (R. 39.) Zalud also testified that she during her sixteen years of employment, she got along with her co-workers, aside from her main boss. (R. 47-48, 53-54.)

Zalud stated that she was taking several different types of medication for ulcers, thyroid deficiency, and hormone deficiency, but the only medications she took for pain were Arthrotec and Tylenol. (R. 39-41.) Her family physician prescribed Arthrotec because she has "arthritis in every joint." (R. 39.) She did not use any assistance devices, like a cane or brace, but used the TENS unit "most all the time" except when sleeping. (R. 42.) When asked by the ALJ to describe the worst problem that prevents her from working, she stated her back and legs "kill" her, referred to "trouble" with her feet, and claimed that her knee gives out and she goes "numb." (R. 41-42.) She further testified that because her legs are weak, she could not care for herself. (R. 42.) Zalud stated she had difficulty getting in and out of the bathtub and had to sit down to get dressed and put her shoes and stocks on. (R. 52.) She could stand for fifteen to twenty minutes before she got bad pain in her back and in her hips which usually went down the back of her legs. (*Id.*)

Zalud testified that she had lost her house and did not have a place to live but had been staying with a male friend in his mobile home for the past six weeks. (R. 36, 44-46, 50.) Before living with the friend, she lived with her daughter. (R. 44, 53.) She described her daily activity as

"laying around" the house, occasionally reading science magazines and books. (R. 45, 48.) She did

not have any hobbies. (R. 51.) Zalud periodically drove her car to visit her daughter who lived down

the street and once in a while went to the store. (*Id.*) Her friend did the laundry, vacuuming, and

sweeping because she found it too painful to bend down. (R. 49-50.) She did not engage in any

outdoor activities but occasionally walked her friend's dog. (R. 51-52.)

Zalud testified that she started seeing her family physician, Dr. Lee, for depression a few

years prior to the hearing because she was getting "[a] lot of harassment" at work and because her

employer sent her home from work and denied her all of her benefits. (R. 45-46.) She said she once

saw a psychiatrist who prescribed medication, but she discontinued use because it caused stomach

problems. (R. 46.) Zalud also testified that she said saw a counselor for about four sessions in the

past but was not receiving any psychotherapy or group therapy at the time of the hearing. (R. 47.)

## C. *ALJ Decision*

The ALJ found the evidence established that Zalud has "severe" physical and mental

impairments, including degenerative disc disease of the lumbosacral spine and situational depression.

(R. 18, 24.) He then found that the medical evidence failed to establish that any of the impairments

or a combination of impairments met the level of severity listed in 20 C.F.R. Pt. 404, Subpt. P, App.

1. (R. 18.)

The ALJ concluded that Zalud was not capable of performing her past work as a chemical

operator. (R. 24.) He determined that according to the medical evidence in the record, Zalud had

the residual functional capacity to perform work that would not require lifting objects weighing more

than ten pounds or standing or walking for more than two hours in an eight-hour day. (R. 24.) He

also found that Zalud is restricted to unskilled jobs that afford her the opportunity to alternate

-11-

between sitting and sitting at her discretion and also in an environment that requires no more than occasional interaction with supervisors or the public. (*Id.*)

In determining Zalud's functional capacity, the ALJ took into consideration the objective medical evidence reported by Dr. Cerniak, Dr. Corrall, Dr. Sinha, Dr. Jacobs, and Dr. Kattner. The ALJ also considered the fact that the record as a whole reflected a number of inconsistencies which shed doubt upon Zalud's credibility about the severity of her pain and impairments. (R. 19-22.)

Based upon Zalud's age, education, and work experience and residual functional capacity, the ALJ concluded Zalud could perform unskilled, sedentary work, with the restrictions described above. (R. 24-25.) The ALJ further determined that there were a significant number of jobs in the economy that Zalud could perform, specifically jobs that fall within the category of small parts and small products assembly work. (R. 24-25.) The ALJ's decision adopted the opinion of the vocational expert, who found that a hypothetical individual, like Zalud, with the same age, education, and work experience and functional limitations established by the record could perform and find a number of sedentary jobs in the State of Illinois. (R. 54-55.) The vocational expert estimated that there are 20,000 such jobs in the State of Illinois of which eighty-five to ninety percent, or 17,000 to 18,000 jobs, would provide the sit-stand option that Zalud requires. (*Id.*) The vocational expert also estimated that between 3,400 and 3,600 of those jobs are available in Zalud's geographic job market. (R. 56.)

The ALJ found that Zalud suffers from situational depression but that her activities of daily living are "no more than slightly restricted" by her mental condition, and her ability to function socially is "no more than moderately impaired." (R. 17.) The ALJ noted that despite Zalud's claim that she has come very close to suicide, she did not take any type of psychotropic medication for her

-12-

depression, she participated in a total of only four counseling sessions, she had not actively sought psychiatric treatment, and her only documented treatment specifically for depression was at the BroMenn Healthcare emergency room on May 30, 1997, nine days after she applied for disability benefits. (*Id.*) The ALJ concluded that Zalud's mental condition and functioning would have improved if she if she participated in treatment and that her level of impairment was not severe enough to prevent her from performing any gainful activity. (R. 17-18.) He also found that her level of "concentration, persistence, and pace" was sufficient to fulfill the demands of at least unskilled work. (R.17.)

The AJL concluded that Zalud was "not disabled" from any relevant time from her alleged onset date of disability on August 31, 1996, through the date of the decision, February 19, 1999, and therefore was not eligible for Social Security benefits. (R. 23-25.)

## DISCUSSION

### A.    *The ALJ's Legal Standard*

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)-(f).

An affirmative answer at either step 3 or 5 leads to an automatic finding of disability. *Young v. Secretary of Health and Human Services*, 957 F. 2d 386, 389 (7th Cir.1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *(Id.)* The claimant bears the burden of proof at steps 1 through 4. *(Id.)* Once the claimant shows an inability to perform past work, however, the burden shifts to the Commissioner to show the claimant has the ability to engage in other work existing in significant numbers in the national economy. *(Id.)*

**B.**     ***Judicial Review***

Section 405(g) of the Social Security Act provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Ehrhart v. Sec'y of Health & Human Serv.*, 969 F.2d 534, 538 (7th Cir. 1992) (citations omitted). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant he must build an accurate and logical bridge from the evidence to his conclusion." *Dixon v. Massanari*, 270 F.3d 1171,1176 (7th Cir. 2001) (citation omitted); *see also*

*Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070,1076 (7th Cir. 1992) ("We have repeatedly stated . . . that an ALJ must 'minimally articulate his reasons for crediting or rejecting evidence of disability.'")).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the Court. *Stuckey v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990). However, the ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19F.3d 329,333 (7th Cir. 1994).

## C.    *Analysis*

Zalud raises several arguments in support of her motion for summary judgment.[2] She claims the ALJ erred by not ensuring the administrative record was complete; concluding she was not credible; wrongly evaluating her residual functional capacity; and improperly relying on incorrect testimony by the vocational expert.

### 1.    Additional Medical Evidence

Zalud first argues that the ALJ failed in his duty to obtain all pertinent available medical records and erred by not making sure the file was complete. At the administrative hearing, Zalud's counsel advised the ALJ that the claimant had two additional files to enter into the record: a medical file from a Dr. Wright, whom the attorney said Zalud saw for gallbladder surgery, and records from a counselor or counselors whom Zalud saw four or five times in the year before the hearing. The

---

[2]Because Zalud does not challenge the ALJ's findings with respect to her mental impairment, this analysis is limited to her physical impairments. *See Jones v. Shalala*, 10 F.3d 522, 525 n. 4 (7th Cir. 1993) (stating that when issues are not discussed in the body of the brief they are generally waived).

ALJ gave Zalud one month after the hearing to supplement the record, but neither Zalud nor her attorney[3] filed the reports. (R. 20.) Zalud now argues that the ALJ erred by not affirmatively ensuring the information was added to the record.

The ALJ in a Social Security hearing has a duty to fully develop the record "if the evidence before her is insufficient to determine whether a claimant is disabled or, after weighing the conflicting evidence, she cannot reach a conclusion." *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). In this case the ALJ had before him a substantial number of medical reports from several doctors, most of whom were treating Zalud's treating physicians. The record also includes a great deal of objective medical test results, including myelograms, MRI reports, and x-rays. There was little conflict in the medical reports, none of which supported a finding of debilitating pain. There was a substantial amount of evidence in the record, and the ALJ's determination that he did not need additional information to reach a conclusion was not clear error.

Furthermore, the ALJ did agree to keep the record open so Zalud could submit the additional medical records, and it was Zalud's responsibility to ensure that all favorable evidence was submitted to the ALJ in a timely manner. 20 C.F.R. § 404.1512(c). Zalud was represented by counsel, so the ALJ had no heightened obligation to see that the record was more fully developed. *See Nelson v. Apfel,* 131 F.3d 1228, 1235 (7th Cir.1997); *see also Luna,* 22 F.3d at 693 (holding that even with a *pro se* plaintiff, the ALJ is not required "to update objective medical evidence to the time of hearing").

---

[3]Zalud has since obtained new counsel.

In any event, it is highly doubtful the ALJ's decision would have changed even if had he seen

the records.[4] The additional materials are medical records were from Dr. Wright, who began treating

Zalud in February 1998 for complaints of pain in her feet and left hand.[5] The records reveal that Dr.

Wright ordered an MRI and diagnosed Zalud with a tender tumor in her left palm. Zalud was fitted

for a splint, and the doctor ordered and EMG, a nerve conduction study, and a bone scan. The bone

scan revealed no focal abnormalities, and Dr. Wright diagnosed Zalud in March 1998 with

tenosynovitis (inflammation of the lining of the tendon). The EMG examination was normal as to

the lower extremities. The interpreting physician concluded that Zalud's lower extremity pain may

have been caused by bony disease related to renal stones or to a small fiber peripheral neuropathy.

Dr. Wright advised Zalud that she could plan an excisional biopsy along with release of the tendon

and decompression of the tendon sheath. Zalud was told that she could be left with some numbness,

but she responded that "Anything would be better than the pain." Zalud subsequently missed an

appointment on March 31, 1998, and it was rescheduled for April 8, 1998. Zalud cancelled that

appointment and never rescheduled another one.

According to her attorney's statements at the administrative hearing (R. 33), Zalud also saw

Dr. Wright in relation to gallbladder surgery, but those records were not submitted to the Court with

Zalud's motion for summary judgment. Dr. Wright's clinical notes also state that Zalud suffers from

fibromyalgia and intermittent porphyria. However, these diagnoses appear to be self-reported by

Zalud, and there is no medical evidence or medical opinion in the record to support either one. The

---

[4]Zalud attaches to her motion for summary judgment only Dr. Wright's records. It is not known what became of the counselors' reports and why they are not also attached as exhibits.

[5]The materials are attached as an exhibit to Zalud's motion for summary judgment, and the pages are not sequentially numbered.

records submitted also do not indicate that Dr. Wright treated Zalud for either of those conditions.

None of this additional medical evidence refers to any physical limitations or pain caused by that stated conditions. More significantly, Zalud did not testify at all about these problems at the administrative hearing that took place only a few months after her appointments with Dr. Wright. Therefore, these additional records would likely not have altered the ALJ's conclusion that Zalud is not disabled, and the ALJ's failure to ensure they were made a part of the record does not constitute a "significant omission" warranting a reversal or remand of the Commissioner's decision. *See Nelson*, 131 F.3d at 1235; *Luna*, 22 F.3d at 693.

## 2. Credibility

Second, Zalud argues that the ALJ erred in finding she was not a credible witness and that her testimony concerning the severity of symptoms and the extent of her physical limitations was not consistent with the medical evidence.

An ALJ's credibility determination will usually not be overturned unless it is patently wrong. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citation and internal quotation omitted). In determining whether an allegation of pain is credible, the ALJ may consider a number of factors including the nature and intensity of the pain, precipitating and aggravating factors, the dosage and effectiveness of pain medication and other treatment for pain relief, functional restrictions, and daily activities. *Id.* If an ALJ finds there are inconsistencies between the medical evidence and the claimant's complaints of pain, the ALJ must ask the claimant specific questions about her daily activities, the pain, and its effects; and "investigate all avenues presented that relate to pain," which may include the claimant's work history and the observations of physicians and third parties. *Id.*

Zalud argues the ALJ reached his conclusion about her credibility without giving her the opportunity to explain the inconsistencies at the hearing. The ALJ questioned Zalud extensively about her daily activities, her pain, and her treatment of the pain, and in reaching his conclusion, he took into account the considerable medical evidence in the record. The ALJ's opinion enumerated several specific inconsistencies between Zalud's testimony and the evidence in the record, including that Zalud's complaints of severe debilitating pain were not supported by any of the medical evidence; her testimony greatly exaggerated the severity of her medical diagnoses and the treatment recommended by her physicians; and she refused to participate in conservative pain management treatment despite her complaints of severe pain. In addition, Zalud was not prescribed any medication for her allegedly disabling pain and took only over-the-counter Tylenol.

In light of these specific inconsistencies, which are supported by the record, the ALJ was reasonable in concluding that Zalud's claims of severe, debilitating pain were not credible. Zalud does not offer any new evidence or arguments that could not have been raised at the administrative hearing, where Zalud testified and was represented by counsel.[6] Moreover, even if some of the

_____

[6]Zalud did submit a supplemental reply brief in support of her motion, which attached a page from an article apparently found on an internet medical content site. The article states that conjoined nerve roots, which was indicated on a September 1984 myelogram of Zalud, "may stimulate disk herniation." Zalud argues that this suggests that patients with conjoined nerve roots are harder to treat and thus that her complaints of pain are credible. However, Zalud's diagnosis of conjoined nerve root occurred nearly twelve years before she suffered the injury that allegedly caused her to be disabled, and this diagnosis is not repeated elsewhere in the record. (The date on the myelogram is distorted, and Zalud identified it as a 1988 myelogram. However, contemporaneous records show clearly that it was from 1984. (See R. 189.)) First, this evidence was available to Zalud at the hearing. Second, a 12 year-old diagnosis did not have to be included in the record at all. A claimant's "complete medical history" includes only the 12 months preceding the application for benefits. See Luna, 22 F.3d at 692-93.

reasons underlying the ALJ's credibility determination are not persuasive by themselves, the Court finds that his ultimate conclusion as to credibility was supported by substantial evidence.

### 3. Residual Functional Capacity

Third, Zalud argues that the ALJ erred in evaluating her residual functional capacity. She states that the ALJ wrongly assumed that her only functional problem is that she must change positions frequently. Zalud's motion summarily claims, without further argument or support, that her "pain with movement" would affect her concentration and thus have more of an effect on her residual functional capacity than just creating the need for a sit/stand option.

The ALJ's determination of Zalud's residual functioning is well supported by the objective and subjective medical evidence together with the other evidence in the record. Zalud offers no support for her argument that the ALJ's residual functioning determination did not take pain into consideration in any way. Indeed, the reason for the sit/stand option is to alleviate pain caused by prolonged sitting, standing, or walking. And as discussed above, the ALJ did consider whether Zalud suffered from prolonged, debilitating pain that would have resulted in a substantial non-exertional impairment, and he determined that Zalud did not suffer from that level of disabling pain.

### 4. Vocational Expert

Zalud last argues that the ALJ erred in relying on the testimony of the vocational expert for three reasons: first, the testimony conflicted with the Dictionary of Occupational Titles; second, the expert wrongly concluded that a small parts assembly worker could alternate between sitting and standing at her discretion; and third, the expert's assertion that a person could be a small parts assembly worker and have only occasional contact with supervisors and co-workers was a factual error.

First, Zalud had an opportunity to question the vocational expert about these issues at the administrative hearing, but she failed to do so. Her failure is not reason to overturn the ALJ's decision. *See Ragsdale v. Shalala*, 53 F.3d 816, 819 (7th Cir. 1995). Moreover, an ALJ is entitled to rely on a vocational expert's testimony in response to specific questions, even if that testimony conflicts with the Dictionary of Occupational Titles or other general occupational descriptions. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). For example, even if an unskilled worker is ordinarily one who cannot alternate between sitting and standing at her discretion, the ALJ can rely on the testimony of a vocational expert who contradicts that testimony in response to a direct question. In this case, the vocational expert was first asked how many sedentary, unskilled jobs were available for someone with Zalud's personal characteristics and work history, then he was asked to provide the number of those jobs that had a sit/stand option. The ALJ, therefore, reasonably relied on the uncontradicted testimony of the vocational expert in determining that there were a significant number of jobs in the local economy (3,400 to 3,600) that could accommodate Zalud's limitations on sitting and standing as well as contact with co-workers and supervisors. *See, e.g., Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (holding that 1,400 jobs in the greater Milwaukee area was a significant number of available jobs that could accommodate the plaintiffs restrictions).

## CONCLUSION

For the reasons set forth above, Zalud's Motion for Summary Judgment is DENIED.

E N T E R:

**Nan R. Nolan**
**United States Magistrate Judge**

SEP 0 4 2002
**Dated:** _____

-22-